

2008 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-14-2008

# In re:Old Summit Mfg

Precedential or Non-Precedential: Precedential

Docket No. 06-3838

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2008

Recommended Citation

"In re:Old Summit Mfg " (2008). *2008 Decisions.* Paper 1294.
http://digitalcommons.law.villanova.edu/thirdcircuit_2008/1294

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2008 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 06-3838

IN RE: OLD SUMMIT MANUFACTURING, LLC
f/k/a SUMMIT MANUFACTURING LLC,

Debtor

WILLIAM G. SCHWAB, ESQ.

v.

PENNSUMMIT TUBULAR, LLC;
NEW SUMMIT MANUFACTURING,

Appellants

Appeal from the United States District Court
for the Middle District of Pennslvania
(D.C. Civil Action No. 05-cv-00981)
District Judge: Honorable A. Richard Caputo

Argued September 25, 2007

Before: AMBRO, JORDAN and ROTH, <u>Circuit Judges</u>

(Opinion filed: April 14, 2008)

Bruce A. Herald, Esquire
Goldberg, Meanix & Muth
135 West Market Street
West Chester, PA   19382

David J. Harris, Esquire (Argued)
Suite 310
15 Public Square
Wilkes-Barre, PA   18701

      Counsel for Appellant

Jason Z. Christman, Esquire (Argued)
William G. Schwab, Esquire
William G. Schwab & Associates
P.O. Box 56
811 Blakeslee Boulevard Drive East
Lehighton, PA   18235

      Counsel for Appellee

_____

OPINION OF THE COURT
_____

AMBRO, <u>Circuit Judge</u>

2

This case stems from the sale of the assets of a steel products manufacturer in bankruptcy. We decide whether three checks that were received, but had not cleared, before the closing of the sale are included in the assets sold. We conclude that they are not, and thus affirm the decision of the District Court (which in turn affirmed that of the Bankruptcy Court).

I

Old Summit Manufacturing, LLC ("Old Summit"), a maker of tubular steel products, filed for bankruptcy in July 2002.[1] Appellee William Schwab serves as its Chapter 7 bankruptcy trustee. In November 2003, he filed an avoidance action against appellants New Summit Manufacturing, LLC ("New Summit") and PennSummit Tubular, LLC ("Penn Summit") (collectively, "Purchasers") in the United States Bankruptcy Court for the Middle District of Pennsylvania. He alleged that Old Summit and New Summit, the parties to an agreement transferring Old Summit's assets (the "Agreement"), had interpreted it incorrectly, resulting in the incorrect transfer of $29,540.37 to Purchasers.[2]

---

[1]Old Summit initially filed under Chapter 11 of the Bankruptcy Code, but the case was converted to Chapter 7 in February 2003.

[2]Penn Summit was not party to the Agreement. New Summit transferred Old Summit's assets to Penn Summit after the performance of the Agreement.

The Agreement included in the sale "all accounts receivable of [Old Summit] related to the business," Agreement § 1.1(b), and "all other assets of [Old Summit] related to the Business wherever located, tangible or intangible," Agreement §1.1(l). It excluded from the sale "all cash and cash equivalents of [Old Summit,] whether on hand, in transit or in banks or other financial institutions, security entitlements, security accounts, commodity contracts and commodity accounts; *provided, however*, if the Closing does not occur on or before September 4, 2002, [New Summit] shall be entitled to the Collected Receivables." Agreement § 1.2(a).[3]

The parties stipulated to the following facts before the Bankruptcy Court:

> 1. Subject to the terms of an Asset Purchase Agreement, dated, executed, and approved by an Order of [the Bankruptcy Court] on September 4, 2002, [Old Summit] sold substantially all its assets to New Summit, and pursuant to Paragraph 1.1(b), all its receivables. New Summit transferred to

---

[3]Agreement § 1.1(k) defines as "Collected Receivables" (in the event that the closing did not occur on or before September 4, 2002) "any payments made to [Old Summit] with respect to any accounts receivable of [Old Summit] related to the Business (other than with respect to intercompany accounts receivable . . . ) on or after September 4, 2002 until the Closing."

Penn Summit the assets that it acquired from [Old Summit]. . . .

2. On September 3, 2002, [Old Summit] received the following checks: $285.00 from T-Mobile U.S.A., $28,852.00 from Oakland Reserve, Ltd., and $403.37 from Triton PCS Operating Co., LLC d/b/a . . . Suncom, for a total of $29,540.37.

3. [Old Summit's] employee, Kathy E. Drasher, shipped the foregoing checks for deposit to IBJ Whitehall Bank and Trust Co. (the "Bank") by Federal Express on September 3, 2002.

4. The checks were then posted by the Bank on September 4, 2002.

5. The checks cleared the Bank on or subsequent to September 4, 2002.

Though not a stipulated fact, Old Summit transmitted $29,540.37 to New Summit on September 17, 2002. Complaint ¶ 12; Answer ¶ 12.[4]

_____

[4]Old Summit describes the transmittal as a "transfer[]." Complaint ¶ 12. New Summit calls it a payment "representing

5

Schwab argued before the Bankruptcy Court that the $29,540.37 sum no longer was an account receivable of Old Summit on September 4, 2002 (the date of closing), and thus should have been excluded from the transaction. Purchasers argued that a tendered check remains an account receivable until the moment it is honored and that a check does not become cash or a cash equivalent until it clears the drawee's bank (in this case, the banks of the three account debtors — T-Mobile, Oakland Reserve, and Triton). Purchasers thus contended that Old Summit was correct to transmit the $29,540.37 sum to New Summit.

The Bankruptcy Court decided the case in favor of Schwab, concluding that the accounts receivable had been reduced by the amount of the checks and that the checks were cash equivalents belonging to Old Summit. Purchasers appealed to the District Court.

The District Court affirmed the decision of the Bankruptcy Court, concluding that "at the time the Agreement closed, the obligation represented by the Checks was discharged and accordingly there was no longer a receivable to include in the transfer." Because they were honored retroactively on the date of receipt, the checks "were no longer checks in the conventional sense" and were "essentially converted to cash

the proceeds from one of the accounts receivable purchased by New Summit." Answer ¶ 12.

equivalents as of September 3, 2002 when the debt was suspended and subsequently discharged." Purchasers timely appealed to us.

## II

We have jurisdiction pursuant to 28 U.S.C. §§ 158(d) & 1291. Our review is plenary. *Sovereign Bank v. Schwab*, 414 F.3d 450, 452 n.3 (3d Cir. 2005). On appeal from a District Court's decision in its bankruptcy appellate capacity, we exercise the same standard of review as the District Court; we review the Bankruptcy Court's legal determinations *de novo* and its factual determinations for clear error. *Id.*

## III

A. Controlling Law

The Agreement provides that it "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania without reference to choice of law principles thereof." Agreement § 12.7. In Pennsylvania,

> [c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement. Courts assume that a contract's language is chosen carefully and that

7

the parties are mindful of the meaning of the language used. When a writing is clear and unequivocal, its meaning must be determined by its contents alone.

*Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped*, 886 A.2d 706, 711 (Pa. Cmwlth. 2005) (internal citations and quotation marks omitted).

A contract is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense. The court, as a matter of law, determines the existence of an ambiguity and interprets the contract whereas the resolution of conflicting parol evidence relevant to what the parties intended by the ambiguous provision is for the trier of fact.

*Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986) (internal citations omitted). However, "[a]n appellate court may draw its own inferences and arrive at its own conclusions when a finding of fact is simply a deduction from other facts and the ultimate fact in question is purely a result of reasoning." *Id.* at 391 n.6. A court always may consider the course of performance as evidence of the intent of the parties. *Atlantic Richfield Co. v. Razumic*, 390 A.2d 736, 741 n.6 (Pa. 1978).

8

B.      Accounts Receivable

Old Summit argues that the checks are not accounts receivable.  Purchasers do not contest this assertion, which is correct under the Pennsylvania Uniform Commercial Code. Under Pennsylvania's UCC,

> [u]nless otherwise agreed and except as provided in subsection (a) [relating to certified checks], if a note or an uncertified check is taken for an obligation, the obligation is suspended to the same extent the obligation would be discharged if an amount of money equal to the amount of the instrument were taken, and the following rules apply:
>
>> (1) In the case of an uncertified check, suspension of the obligation continues until dishonor of the check or until it is paid or certified. Payment or certification of the check results in discharge of the obligation to the extent of the amount of the check.

13 Pa. Cons. Stat. § 3310(b).   The Supreme Court of Pennsylvania recently explained the meaning of this section: "In plain words, payment is conditionally made when the creditor . . . accepts payment by a check from the debtor . . . .  If the check

9

is honored, the condition is removed and payment relates back to the date of acceptance (i.e., receipt)." *Romaine v. Workers' Comp. Appeal Bd. (Bryn Mawr Chateau Nursing Home)*, 901 A.2d 477, 485 (Pa. 2006).

The incorporation of Pennsylvania law into the Agreement, and the absence of any term providing for a departure from that law with respect to accounts receivable, mean that the rule noted above applies here. As a result, that portion of Old Summit's accounts receivable was satisfied conditionally upon receipt of the checks and satisfied unconditionally when the checks cleared (with satisfaction deemed backdated to the date of receipt). Accordingly, the amount of the three checks was no longer included in Old Summit's accounts receivable at the closing on September 4.

C.    Cash Equivalents

Our conclusion that the checks were no longer accounts receivable at the time of the closing does not resolve fully the issue before us. Even if not accounts receivable, the checks, as a matter of contract, still might have been included in the transaction as among "all other assets of Sellers related to the Business[,] wherever located, tangible or intangible." Agreement §1.1(l). We agree, however, with Old Summit that the checks were not part of the transaction by contract. This is because they were cash equivalents excluded within the

meaning of Agreement § 1.2(a).

On the simplest level, it is not clear that the Agreement intended to recognize an asset class that was neither accounts receivable nor cash equivalents. Article 9 of the Uniform Commercial Code, which governs secured transactions, indicates that the checks here should be regarded as cash equivalents. That Article, while not directly applicable here, explains that the term "cash proceeds" means "proceeds that are money, checks, deposit accounts, or the like." 9 U.C.C. § 102(a)(9); codified as 13 Pa. Cons. Stat. § 9102(a). "[O]r the like" means cash equivalents. This is in accord with Black's Law Dictionary, which defines cash as, *inter alia*, "[m]oney or its equivalent" or "negotiable checks." Black's Law Dictionary 229 (8th ed. 2004).[5]

The terms of the Agreement also lead to this conclusion. It covers cash or cash equivalents "in transit." This phrase accurately describes the checks (and underlying funds) at issue here. They had been received, and their deposit at Old

---

[5]Purchasers argue that we should look to federal regulations defining cash and cash equivalents. This argument is unpersuasive, as we conclude that the UCC, which has been incorporated into Pennsylvania law (which, in turn, governs the Agreement), provides more useful guidance than federal law. Moreover, as discussed below, we conclude that the terms of the Agreement support the view that the checks in question should be treated as cash equivalents.

Summit's bank began the transit process from the banks of the three customers to Old Summit's bank account. Thus the Agreement would appear to consider the types of checks received by Old Summit on September 3 to be cash equivalents.

In addition, the Agreement exacts a penalty of Old Summit in the case of failure to close by September 4, 2002. In that event, any payments made to Old Summit with respect to accounts receivable (which would include checks) received after September 4 would be included among the assets sold. "[I]f the Closing does not occur on or before September 4, 2002," the sold assets include "any payments made to [Old Summit] with respect to any accounts receivable of [Old Summit] related to the business . . . on or after September 4, 2002 until the Closing." Agreement § 1.1(k). The negative implication is that the accounts receivable of Old Summit paid by checks of its account debtors prior to September 4 were excluded assets. This suggests that the parties assume that payments clear and become cash equivalents instantaneously. They do not anticipate any delay in the clearance of payments, suggesting that receipt of a payment is sufficient to render it a cash equivalent within the meaning of the Agreement.

Finally, the Agreement sets a range of locations of cash or cash equivalents that suggests a broad definition of "cash equivalents." It lists cash or cash equivalents "whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and

12

commodity accounts." Agreement § 1.2(a). The Agreement does not make clear what it means by the last four items in this list, but these terms imply a definition of cash equivalents that incorporates assets that may not be immediately liquid. This supports an expansive reading of "cash equivalents" that would incorporate the checks received on September 3.

\* \* \* \* \*

In light of these considerations, we conclude that the three checks received by Old Summit before the September 4, 2002 closing, but not cleared until after the closing, remain assets of Old Summit excluded from the sale.[6] We thus affirm.

---

[6]New Summit argues that the subsequent performance of the parties – by the post-closing transmittal to New Summit of the $29,540.37 – demonstrates that the checks are not cash equivalents. It contends that because Old Summit, in performing the Agreement, transmitted the value of the checks to New Summit post-closing, the Agreement must have contemplated those checks being included in the sale to New Summit. However, that mistaken act does not require a contrary result, as it is a poorer indicator of the parties' intent than the terms of the Agreement. This is particularly true given that the Agreement was approved by the Bankruptcy Court. It did not have the benefit of subsequent performance in approving the Agreement, so this could not have informed its understanding of that document.