NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-2206
_____

IN RE: ASHINC CORPORATION, et al,
Debtors

ASHINC Corporation

v.

AMMC VII, Limited; Avenue Capital Group; BDCM Opportunity Fund II, L.P.;
Black Diamond CLO 2005-1 Ltd.; Del Mar Distressed Opportunities Master Fund;
MJX Asset Management, LLC; Par-Four Investment Management;
Spectrum Investment Partners L.P.; Teak Hill – Credit Capital Investments, LLC;
The CIT Group/Business Credit, Inc.; The Official Committee of Unsecured Creditors;
Yucaipa American Alliance Fund II, L.P.; Yucaipa American Alliance (Parallel) Fund II,
L.P.; Bennett Management

Yucaipa American Alliance Fund I, L.P.; Yucaipa American Alliance (Parallel) Fund I,
L.P.; Yucaipa American Alliance II, L.P.; Yucaipa American Alliance (Parallel) Fund II,
L.P.,
Appellants

_____

On Appeal from the United States District Court
for the District of Delaware
(D. Del. No. 1-13-cv-01583)
District Judge: Honorable Sue L. Robinson
_____

Argued December 5, 2016

Before: FISHER,[*] KRAUSE and MELLOY,[**] *Circuit Judges*.

(Filed: March 23, 2017)

Robert A. Klyman   **[ARGUED]**
Kahn A. Scolnick
Maurice M. Suh
Gibson Dunn & Crutcher LLP
333 South Grand Avenue
Los Angeles, CA 90071

Michael R. Nestor
Young Conaway Stargatt & Taylor, LLP
Rodney Square, 1000 North King Street
Wilmington, DE 19801
        *Counsel for Appellants*

Rebecca L. Butcher
Adam G. Landis
Kerri K. Mumford
Landis Rath & Cobb LLP
919 Market Street, Suite 1800
P.O. Box 2087
Wilmington, DE 19801

Robert J. Ward   **[ARGUED]**
Schulte Roth & Zabel LLP
919 Third Avenue
New York, NY 10022
        *Counsel for Appellees*

_____

OPINION[***]

_____

_____

[*] Honorable D. Michael Fisher, United States Circuit Judge for the Third Circuit, assumed senior status on February 1, 2017.

[**] Honorable Michael J. Melloy, Senior Circuit Judge, United States Court of Appeals for the Eighth Circuit, sitting by designation.

[***] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

MELLOY, *Circuit Judge*.

Appellants Yucaipa American Alliance Fund I, L.P., Yucaipa American Alliance (Parallel) Fund I, L.P., Yucaipa American Alliance Fund II, L.P., and Yucaipa American Alliance (Parallel) Fund II, L.P. (together, "Yucaipa") appeal the District Court's order affirming the Bankruptcy Court's order granting summary judgment for BDCM Opportunity Fund II, LP, Black Diamond CLO 2005–1 Ltd., and Spectrum Investment Partners (collectively, "BD/S"), Appellees. We will affirm.

I.

Allied Systems Holdings, Inc. ("Allied") declared bankruptcy in 2005.[1] Allied emerged from that bankruptcy in 2007. Allied financed its emergence from bankruptcy by entering into various loan agreements. In 2012, Allied defaulted on one of those agreements, and a group of creditors filed an involuntary petition for bankruptcy against Allied in bankruptcy court. This appeal arises from that involuntary bankruptcy and involves questions of contract interpretation regarding the rights of lenders under the loan agreement.

When Allied emerged from bankruptcy in 2007, Yucaipa became Allied's majority shareholder with control over Allied's board of directors. To finance Allied's emergence from bankruptcy, Allied entered into the First Lien Credit Agreement ("Credit

---

[1] Allied refers to Allied Systems Holdings, Inc., as well as its subsidiaries. Allied is now known as ASHINC Corporation. Allied was a transportation-services provider for the automotive industry, specializing in delivering new vehicles from manufacturing plants to dealerships.

Agreement"). Pursuant to the Credit Agreement, Allied borrowed $265 million of First Lien Debt from numerous lenders. The First Lien Debt was comprised of: (1) $180 million of Term Loans; (2) a revolving credit facility of $35 million ("Revolving Loans"); and (3) a synthetic letter of credit facility of $50 million ("LC Commitments"). BD/S acquired First Lien Debt pursuant to the Credit Agreement. At the time of the motion for summary judgment in the Bankruptcy Court in the instant case, the outstanding First Lien Debt was $244,047,530.

Under the Credit Agreement, amendments required either the consent of the Requisite Lenders or the consent of all affected Lenders. Credit Agreement § 10.5. Consent of all affected Lenders was required only in certain situations listed in § 10.5(b), including if the amendment had the effect of "amend[ing] the definition of 'Requisite Lenders' or 'Pro Rata Share.'" *Id.* § 10.5(b)(ix). The Credit Agreement defined "Requisite Lenders" as "one or more Lenders having or holding Term Loan Exposure, LC Exposure and/or Revolving Exposure and representing more than 50% of the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders." Credit Agreement § 1.1. "Pro Rata Share" means "(i) with respect to all payments, computations and other matters relating to the Term Loan of any Lender, the percentage obtained by dividing (a) the Term Loan Exposure of that Lender by (b) the aggregate Term Loan Exposure of all Lenders." *Id.* Additionally, "Term Loan Exposure" means, "with respect to any Lender, as of any date of determination, the outstanding principal

4

amount of the Term Loans of such Lender . . . ." *Id.*

Under the Credit Agreement, before it was amended, Yucaipa was prohibited from being assigned any debt. *See id.* (defining "Eligible Assignee" and expressly excluding the Sponsor, Yucaipa). Further, only original Lender signatories to the Credit Agreement and Eligible Assignees that subsequently become Lenders pursuant to an Assignment Agreement could act as Requisite Lenders. *Id.*

In April 2008, a majority of Lenders approved the Third Amendment[2] to the Credit Agreement, which allowed Yucaipa to acquire a limited amount of Term Loans. Specifically, the Third Amendment made Yucaipa a "Restricted Sponsor Affiliate" and amended the definition of "Eligible Assignee" to provide that "no Restricted Sponsor Affiliate may be an Eligible Assignee with respect to a sale, assignment or transfer of Commitments, Revolving Loans or LC Deposits." Third Amendment § 2.1(c). Thus, Yucaipa was effectively prohibited from acquiring any First Lien Debt other than Term Loans. Further, as the District Court summarized, Yucaipa was:

> [P]rohibited from acquiring Term Loans exceeding the lesser of (i) 25% of the outstanding Term Loan Exposure or (ii) $50 million in principal amount of Term Loans ([Third Amendment] §§ 2.7(c), 2.7(e)); required to make a capital contribution to Allied of no less than 50% of the aggregate principal amount of any Term Loans that Yucaipa obtained within 10 days of the date of acquisition (*id.* § 2.7(e)); prohibited from exercising any and all voting rights it would otherwise have as a Lender 'for all purposes' (*id.* §§ 2.1(e), 2.7(a), 2.7(b), 2.7(e)); and subject to a broadly worded covenant not to sue (*id.* § 2.7).

J.A. 6. The Third Amendment also amended the definition of "Term Loan Exposure,"

---

[2] The first two amendments are not at issue in the instant appeal.

providing that "with respect to any provisions of this Agreement relating to the voting rights of Lenders . . . the aggregate outstanding principal amount of the Term Loans of all Restricted Sponsor Affiliates shall be disregarded for purposes of this definition of 'Term Loan Exposure.'" Third Amendment § 2.1(e). Yucaipa did not acquire any First Lien Debt following the execution of the Third Amendment.

In February 2009, ComVest Investment Partners III, L.P. ("ComVest") purchased approximately 55% of the First Lien Debt and became the Requisite Lender. In August 2009, Allied and ComVest entered into the Fourth Amendment, which changed the definition of "Term Loan Exposure" back to the original definition included in the Credit Agreement, removed the restrictions on the amount and type of debt Yucaipa could acquire, allowed Yucaipa's debt to be counted in the Requisite Lender calculation, and allowed Yucaipa's debt to have voting rights. ComVest was the only Lender that consented to the Fourth Amendment. Contemporaneously with the execution of the Fourth Amendment, ComVest and Yucaipa executed an Assignment Agreement whereby Yucaipa purchased all of ComVest's First Lien Debt. Following this transaction, Yucaipa declared itself the Requisite Lender. Currently, Yucaipa holds $134,835,690 of First Lien Debt, including $114,712,087 of Term Loans and $20,123,602 of LC Commitments.

In January 2012, BD/S filed suit in New York state court, seeking a declaration that the Fourth Amendment was void and that Yucaipa was not the Requisite Lender. The court granted summary judgment in favor of BD/S, finding that the Fourth

Amendment was invalid because § 10.5 of the Credit Agreement required unanimous consent from all Lenders, which was not given. *See BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP,* No. 650150/2012, 2013 N.Y. Misc. LEXIS 1993, at *14 (N.Y. Sup. Ct. Mar. 8, 2013). Thus, the court held, given that the Fourth Amendment was invalid, Yucaipa was not the Requisite Lender. *See id.* at *16. The First Department of the New York Supreme Court's Appellate Division affirmed the lower court's finding that the Fourth Amendment was void and that Yucaipa was not the Requisite Lender. *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP,* 112 A.D.3d 509, 509–11 (N.Y. App. Div. 2013).[3]

In May 2012, while the New York litigation was pending, BD/S filed an involuntary petition for bankruptcy against Allied in bankruptcy court. In October 2012, Allied initiated an adversary proceeding in bankruptcy court seeking a declaration as to the identity of the Requisite Lender and the validity of the Third and Fourth Amendments. BD/S moved for summary judgment seeking a declaration that BD/S is the Requisite Lender under the Credit Agreement.

On July 30, 2013, the Bankruptcy Court granted the motion for summary judgment, finding that BD/S is the Requisite Lender. In its oral ruling, the Bankruptcy Court concluded Yucaipa was collaterally estopped from arguing the Fourth Amendment was valid due to the New York ruling. J.A. 1101:1–2. Further, the Bankruptcy Court

---

[3] The New York Court of Appeals denied further review. *BDCM Opportunity Fund II, LP v. Yucaipa Am. Alliance Fund I, LP,* 8 N.E.3d 849, 849 (N.Y. 2014).

7

found that the Credit Agreement and Third Amendment "are not ambiguous in any way, and the Court can . . . make its determination based on the four corners of the document." J.A. 1099:15–18. The Bankruptcy Court also found that the Third Amendment "affected no lender." J.A. 1103:11–15. Specifically, the Bankruptcy Court found that the Third Amendment affected only Yucaipa's rights and was, therefore, validly enacted with majority Lender consent. J.A. 1103:16–18. Thus, "[u]pon acquiring the debt, Yucaipa subjected itself to the [Credit Agreement] and all of the amendments, including the [T]hird [A]mendment." J.A. 1104:13–15.

Regarding the Requisite Lender determination, the Bankruptcy Court found that under § 2.1(e) of the Third Amendment, "all of the Yucaipa debt cannot be used in determining who the requisite lender is . . . ." J.A. 1103:19–25. Further, the Bankruptcy Court found that the Third Amendment "prohibited Yucaipa from acquiring any revolving loans, and letters of credit, which would [exclude] those to the extent they exist from the denominator in figuring out the requisite lender." J.A. 1104:3–6. The Bankruptcy Court also found that "the document as a whole[ ] remove[s] Yucaipa from being able to act as the requisite lender." J.A. 1104:7–12. Finally, the Bankruptcy Court found that "even under the first amendment alone . . . Yucaipa cannot be the requisite lender because it's not a lender as an implied term, as it's not an original lender or [Eligible Assignee]." J.A. 1104:15–20.

As a result, the Bankruptcy Court held that when the New York court invalidated the Fourth Amendment, BD/S became the Requisite Lender. J.A. 1105:7–12. Removing

8

Yucaipa-held debt from the denominator of the Requisite Lender calculation reduced the denominator from approximately $244 million to approximately $109 million. The Bankruptcy Court concluded that BD/S held 51.7% of the First Lien Debt.

On appeal, the District Court affirmed the Bankruptcy Court's grant of summary judgment in favor of BD/S. The District Court held: (1) the Credit Agreement and the Third Amendment are unambiguous; (2) the Third Amendment is valid; (3) Yucaipa cannot act as the Requisite Lender under the Credit Agreement; (4) any First Lien Debt Yucaipa holds under the Credit Agreement should be excluded from the Requisite Lender determination; and (5) BD/S is the Requisite Lender. Yucaipa timely appealed.

## II.

The District Court had jurisdiction over Yucaipa's appeal from the Bankruptcy Court's order granting summary judgment under 28 U.S.C. § 158(a). We have jurisdiction under 28 U.S.C. §§ 158(d) and 1291. "On appeal from a District Court's decision in its bankruptcy appellate capacity, we exercise the same standard of review as the District Court; we review the Bankruptcy Court's legal determinations de novo and its factual determinations for clear error." *Schwab v. PennSummit Tubular, LLC (In re Old Summit Mfg., LLC)*, 523 F.3d 134, 137 (3d Cir. 2008). Specifically, we review "whether there is a genuine issue of material fact and, if not, whether the moving party is entitled to judgment as a matter of law." *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001) (citation omitted). Our analysis of the Credit Agreement, and the rights and obligations of the parties to the Credit Agreement, is governed by New York law. Credit

9

Agreement § 10.14.

III.

Yucaipa raises three primary arguments on appeal. First, Yucaipa argues that the Third Amendment was not validly enacted because it required unanimous Lender consent, which was not obtained. Second, Yucaipa contends that even if the Third Amendment was validly enacted, Yucaipa's $20 million in LC Commitments were improperly excluded from the Requisite Lender determination and that the Credit Agreement did not prohibit Yucaipa from being the Requisite Lender. As a corollary to that argument, Yucaipa asserts that BD/S is not the Requisite Lender. Third, Yucaipa argues that the Credit Agreement and its related amendments are ambiguous.

A.

Under the Credit Agreement, amendments required either the consent of the Requisite Lender(s), majority Lender consent, or the consent of all affected Lenders. Credit Agreement § 10.5. The Third Amendment was adopted pursuant to the consent of a majority of, but not all, Lenders. Yucaipa argues that because the Third Amendment changed the definition of "Term Loan Exposure," it "necessarily and effectively amended the definitions of Requisite Lenders and Pro Rata Share." Brief for Appellants at 35. Thus, Yucaipa argues, the Third Amendment required unanimous affected Lender consent to be valid.

First, Yucaipa contends that because the definitions of Requisite Lender and Pro Rata Share incorporated Term Loan Exposure, the Third Amendment amended those

10

terms, requiring the consent of all affected Lenders. Yucaipa argues that under the Credit Agreement, Requisite Lender is expressed as an equation: (A Lender's or Lenders' First Lien Debt)/(Total First Lien Debt). Yucaipa contends that the Third Amendment changed the denominator of the equation to ((Total First Lien Debt) − (Yucaipa-Held Debt)). However, the Third Amendment did not change the equation in this manner. Rather, the denominator remains "the sum of (i) the aggregate Term Loan Exposure of all Lenders, (ii) the aggregate LC Exposure of all Lenders and (iii) the aggregate Revolving Exposure of all Lenders." Credit Agreement § 1.1. The change made by the Third Amendment affects calculations done before the Requisite Lender calculation is made. Under the Third Amendment, Yucaipa's debt was excluded from Term Loan Exposure such that the definition of Requisite Lender remained exactly the same. The only difference resulting from the Third Amendment was the number used for Term Loan Exposure in the Requisite Lender calculation. As a result, the Third Amendment did not amend the definition of Requisite Lender and, thus, did not require the consent of all affected Lenders. The same analysis applies to the alleged changed definition of Pro Rata Share.

Second, Yucaipa argues the Third Amendment's change to the definition of Term Loan Exposure affected all Lenders because it made the amount of First Lien Debt smaller for purposes of determining Requisite Lenders and Pro Rata Share. Yucaipa argues that "[d]ecreasing the total size of that pie affected *all* Lenders because it *increased* the percentage of first lien debt each Lender owned and thereby allowed a

small minority lender or group of lenders to become Requisite Lender and make decisions affecting all lenders without holding 50% or more of the first lien debt." Brief for Appellants at 44.

However, as the District Court held, the Third Amendment affected no Lender. In so holding, the District Court explained that, under the Third Amendment, only Yucaipa's rights were affected, not the rights of other Lenders. Further, the District Court stated that "the Third Amendment's provision that Term Loans acquired by Yucaipa were expressly disregarded for purposes of Term Loan Exposure and could not be counted in the Requisite Lender calculation affected Yucaipa only." J.A. 21.

The District Court's holding is correct. The Third Amendment did not affect all Lenders. Rather, the Third Amendment impacted and limited Yucaipa's rights only, granting Yucaipa the ability to acquire a limited amount of Term Loans and stripping that debt of any voting rights. Under the original Credit Agreement, Yucaipa could never become the Requisite Lender because it was not a Lender and was not an Eligible Assignee such that it might become a Lender. Thus, the Third Amendment's restrictions on Yucaipa and the exclusion of Yucaipa's debt from Term Loan Exposure was consistent with the original Credit Agreement. No Lender was affected because Yucaipa remained unable to become the Requisite Lender.

Finally, Yucaipa argues the Third Amendment is invalid because the changes it made to "Term Loan Exposure" were similar to the changes made in the Purported Fourth Amendment, which was invalidated in New York state court for lack of

unanimous consent. However, the New York court held that the Purported Fourth Amendment required unanimous consent because, under that Amendment, for the first time, Yucaipa could become the Requisite Lender. As discussed above, the Third Amendment made no such change.[4]

Based on the foregoing discussion, the Third Amendment was validly enacted. The Third Amendment did not amend the definition of Requisite Lenders or Pro Rata Share. Furthermore, no Lender was affected by the Third Amendment. As a result, unanimous Lender consent was not required to approve the Third Amendment and the Third Amendment is valid.

## B.

## i.

Based on its belief that the Third Amendment is invalid, Yucaipa argues the District Court erred when it held that Yucaipa could not serve as the Requisite Lender under the original Credit Agreement and that BD/S is the Requisite Lender. In so

---

[4] On appeal, the New York Appellate Division explained that "given the no-waiver clause of the credit agreement, the lenders' failure to insist on unanimous consent for the third amendment does not prevent plaintiffs from insisting on unanimous lender consent for the fourth amendment." *BDCM Opportunity Fund II,* 112 A.D.3d at 511. Thus, Yucaipa's argument that if the Purported Fourth Amendment is invalid for lack of unanimous consent, the Third Amendment is invalid too, fails if the Lenders that did not consent have waived the lack of consent. As BD/S explains, "none of the Lenders that Yucaipa claims were 'affected' by the Third Amendment ever complained that their consent was not obtained." Brief for Appellees at 26. Further, subsequent actions by the Lenders were consistent with the existence of the Third Amendment. Neither party addressed a possible waiver or ratification issue in its brief, but it may be relevant to the applicability of the Third Amendment.

arguing, Yucaipa asserts that while the Credit Agreement prohibited Yucaipa from being an Eligible Assignee, it did not prohibit Yucaipa from being a Lender. Further, Yucaipa argues that the fact that Yucaipa was not an Eligible Assignee did not prohibit Yucaipa from acquiring debt. Rather, it gives rise to a claim against the Lender that makes an assignment of debt to Yucaipa. Thus, Yucaipa claims "*[a]ny Person* can obtain first lien debt. Any restrictions in the definition of Eligible Assignee can apply only to Lenders seeking to *assign* their debt to Non-Eligible Assignees." Brief for Appellants at 58.

The Credit Agreement defined "Lender" as "each financial institution listed on the signature pages hereto as a Lender, and any other Person that becomes a party hereto pursuant to an Assignment Agreement." Credit Agreement § 1.1. Based on this definition, Yucaipa could not be a Lender because it was not an original signatory. Further, Yucaipa could not become a party to the Credit Agreement pursuant to an Assignment Agreement because it was not an Eligible Assignee. For an Assignment Agreement to become effective, the assignee was required to "represent[ ] and warrant[ ] as of the Closing Date or as of the Assignment Effective Date that (i) it is an Eligible Assignee." Credit Agreement § 10.6(e). The Credit Agreement further stated that an assignee becomes a Lender "subject to the terms and conditions of this Section 10.6." *Id.* § 10.6(f). Yucaipa could not represent and warrant that it was an Eligible Assignee.

This analysis is consistent with the New York court's findings regarding the validity of the Purported Fourth Amendment. There, the court noted, "There is no credible dispute that under the terms of the Credit Agreement as initially drafted and

executed, [Yucaipa], as the 'Sponsors' and controlling shareholders of [Allied], were absolutely prohibited from being a Lender to Allied, or an Eligible Assignee of a Lender . . . ." *BDCM Opportunity Fund II,* 2013 N.Y. Misc. LEXIS 1993, at *9.

Further, under the Third Amendment, Yucaipa could never be the Requisite Lender. This is because restrictions in the Third Amendment specifically limited the amount of debt Yucaipa could validly hold. Yucaipa could not hold Term Loans that exceeded the lesser of (i) 25% of the outstanding Term Loan Exposure or (ii) $50 million in principal amount of Term Loans. Third Amendment §§ 2.7(c), 2.7(e). Further, the Third Amendment restricted Yucaipa to acquiring Term Loans only; Yucaipa could not acquire Revolving Loans or LC Commitments. *See id.* Finally, any Term Loans Yucaipa holds were stripped of voting rights and are specifically excluded from the calculation of Term Loan Exposure. *Id.* §§ 2.1(e), 2.7(a), 2.7(b), 2.7(e). As a result of these prohibitions and restrictions, Yucaipa could never hold enough of the First Lien Debt to become the Requisite Lender.

ii.

Because of the prohibitions and restrictions imposed in the Third Amendment, none of the First Lien Debt that Yucaipa holds can be included in the Requisite Lender calculation. Yucaipa argues that there is no basis to exclude Yucaipa's LC Commitments from the Requisite Lender calculation. Yucaipa contends that the Third Amendment excluded only Term Loans from the calculation but is silent regarding LC Commitments. However, the Third Amendment was silent regarding the inclusion of Yucaipa-held LC

Commitments in the Requisite Lender calculation because Yucaipa was prohibited from holding LC Commitments. Thus, there was no need to expressly exclude them from the Requisite Lender calculation. As the District Court held, "if Yucaipa cannot vote what it was permitted to own, it certainly cannot vote what it was forbidden from owning." J.A. 32.

Yucaipa argues that regardless of how it acquired the First Lien Debt it was prohibited from holding, it should be able to vote that debt because the Credit Agreement is silent. However, "contractual language must be read in context." *LightSquared LP v. SP Special Opportunities LLC (In re Lightsquared Inc.)*, 511 B.R. 253, 335 (Bankr. S.D.N.Y. 2014). In *Lightsquared*, the court focused on the spirit of the credit agreement, holding that the party that "found a loophole in the express terms of the Credit Agreement and exploited it," *id.* at 336–37, "must be held accountable," *id.* at 339. It would be inequitable to allow Yucaipa "to achieve an 'end run' around the substance of the Eligible Assignee restrictions in the Credit Agreement and undercut what [Yucaipa] certainly knew the restrictions were designed to prevent." *Id.* at 339.

It is clear Yucaipa knew that it was prohibited from acquiring LC Commitments and that the Third Amendment restricted Yucaipa's rights as a Lender. Yucaipa's argument that the express language in the Third Amendment does not exclude LC Commitments is an attempted "end run" around the intent to limit Yucaipa's holdings and prevent Yucaipa from becoming the Requisite Lender. Yucaipa should not benefit from the fact that the Third Amendment was silent on whether LC Commitments are part

16

of the Requisite Lender calculation because Yucaipa was prohibited from holding that debt to begin with.

iii.

As a result of the foregoing discussion, the Requisite Lender calculation should be made after excluding the entire amount of First Lien Debt owned by Yucaipa from the Total First Lien Debt. Yucaipa's Term Loans should be excluded based on the language of the Third Amendment and Yucaipa's LC Commitments should be excluded because to include them would be an inequitable "end run" around the clear intent of the Third Amendment. Yucaipa holds approximately $115 million in Term Loans and $20 million in LC Commitments, totaling $135 million of the total First Lien Debt. The total outstanding First Lien Debt is approximately $244 million. Thus, the denominator in the Requisite Lender calculation is $109 million. BD/S holds approximately $56.5 million of First Lien Debt. The Requisite Lender equation, then, becomes $56.5 million/$109 million, which equals 51.7%. To be Requisite Lenders, Lenders must own more than 50% of the First Lien Debt. At 51.7%, BD/S as a collective satisfies that requirement, and the District Court correctly held that BD/S is the Requisite Lender.

C.

Notwithstanding the foregoing, Yucaipa contends the Credit Agreement and Third Amendment are ambiguous, and, thus, Yucaipa should have been allowed to present extrinsic evidence to clarify the parties' intent. Specifically, Yucaipa seeks to present

17

evidence of an earlier draft of the Third Amendment. We conclude the Credit Agreement and Third Amendment are unambiguous, and the District Court correctly declined to consider Yucaipa's extrinsic evidence.

Under New York law, a contract's intent and whether or not a contract is ambiguous are largely related. As a threshold matter, "[i]n interpreting a contract, the intent of the parties governs." *Am. Express Bank Ltd. v. Uniroyal, Inc.*, 164 A.D.2d 275, 277 (N.Y. App. Div. 1990). Courts look to the plain language of the agreement as a whole to find the parties' intent. *See id.* Further, we must avoid "interpretations that render contract provisions meaningless or superfluous." *Manley v. AmBase Corp.*, 337 F.3d 237, 250 (2d Cir. 2003). Finally, if reasonable minds could find that the language of a contract has only one meaning, the contract is unambiguous. *See State v. Home Indem. Co.*, 486 N.E.2d 827, 829 (N.Y. 1985).

"Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs., Inc. v. Giancontieri*, 566 N.E.2d 639, 642 (N.Y. 1990). Like intent, ambiguity is determined based on the contract as a whole. *See id.* Finally, "[i]t is well settled that 'extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous on its face.'" *Id.* (quoting *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 248 N.E.2d 576, 580 (N.Y. 1969)).

Yucaipa argues that the Credit Agreement was unclear whether it was proper to exclude Yucaipa's Term Loans from the Requisite Lender calculation. Yucaipa claims it

18

was not clear that the Third Amendment's provision stripping the voting rights of Yucaipa-held debt related to the Requisite Lender calculation. However, the Third Amendment unambiguously excluded Yucaipa's Term Loans from the determination of Term Loan Exposure. Term Loan Exposure is a part of the Requisite Lender calculation. Thus, it is unambiguous that Yucaipa's Term Loans should be excluded from the Requisite Lender calculation.

Further, Requisite Lenders exercise their rights through voting but the Third Amendment stripped Yucaipa of voting rights. Yucaipa alleges that because the Third Amendment was adopted without language that was included in an earlier draft that "expressly excluded Yucaipa's debt holdings in the definition of Requisite Lenders," the parties' intent to exclude Yucaipa's debt holdings was ambiguous. Brief for Appellants at 62. However, the plain language of the Third Amendment and the Credit Agreement was unambiguous; it would be improper to consider this extrinsic evidence because it creates an ambiguity. *See W.W.W. Assocs.*, 566 N.E.2d at 642. It is clear that because Yucaipa is stripped of voting rights, and the Requisite Lender acts by voting, Yucaipa cannot be the Requisite Lender.

Finally, Yucaipa argues that the Credit Agreement was ambiguous regarding the parties' intent to prohibit Yucaipa from ever becoming the Requisite Lender. Yucaipa contends that it was improper for the court to look at the parties' intent to interpret the Credit Agreement and that intent could not be drawn from the four corners of the contract. However, as discussed above, courts regularly look to the plain language of a

contract to determine intent. In this case, both the Bankruptcy Court and the District Court relied on contract provisions to support the conclusion that such an intent existed. The Courts did not resolve competing inferences, as Yucaipa claims. Rather, they construed the definitions in the Credit Agreement for "Requisite Lender," "Eligible Assignee," and "Lender" in a manner that was consistent with the Credit Agreement as a whole. As discussed above, those provisions made clear that the parties' intent was to prohibit Yucaipa from ever becoming the Requisite Lender. Thus, the District Court did not err by holding that the Credit Agreement and the Third Amendment are unambiguous.

IV.

For the foregoing reasons, we will affirm the judgment of the District Court.