**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 21-1616
_____

NEVILLE CHEMICAL COMPANY
Appellant

v.

TIG INSURANCE COMPANY,
successor-in-interest to Transamerica Insurance Company
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(District Court No.: 2-17-cv-00334)
Chief Magistrate Judge:  Hon. Cynthia R. Eddy
_____

Argued on February 10, 2022

(Filed April 26, 2022)

Before:  GREENAWAY, JR., SCIRICA, and RENDELL, *Circuit Judges*.

Brett W. Farrar, Esq.  [Argued]
J. David Ziegler, Esq.
Dickie McCamey & Chilcote
Two PPG Place
Suite 400
Pittsburgh, PA 15222

       Counsel for Appellant

Christopher J. Haselhoff, Esq.  [Argued]
Summerly E. Kulik, Esq.
Gordon Rees Scully Mansukhani
707 Grant Street

Suite 3800
Pittsburgh, PA 15219

Counsel for Appellee

_____

O P I N I O N*

_____

RENDELL, *Circuit Judge*.

This is an insurance coverage dispute case. The insured, Neville Chemical

Company ("Neville"), appeals from the District Court's order granting summary

judgment to its excess workers' compensation insurer, TIG. We agree with the District

Court that coverage under the excess workers' compensation policy was never triggered

because Neville's losses as to any "occurrence," as defined by the policy, never reached

the self-insured retention limit, which is a prerequisite to the excess coverage. We will

affirm.

I.

Neville, a Pittsburgh hydrocarbon resins manufacturer, maintained a self-insured

workers' compensation program. To supplement this program, Neville purchased a

"Specific Excess Workers Compensation Policy" ("Policy") from Transamerica

Insurance Company, TIG's predecessor. Under this Policy, after Neville provided

workers' compensation benefits up to the Self-Insured Retention ("SIR") limit of

$500,000 per occurrence, TIG was required to indemnify Neville for all workers'

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

2

compensation benefits exceeding the SIR limit. Neville renewed this Policy each year until at least January 1, 1994.

The injuries sustained by Lawrence Kelley occurred on three occasions during his employment with Neville. On June 24, 1993, Kelley injured his back ("first injury"). After an examination, the company's doctor concluded that Kelley suffered from a "disc herniation of L5-S1." App. 281-82. With this diagnosis, Kelley took leave and filed a workers' compensation claim. Neville accepted liability and began paying him benefits. Kelley returned to work in December 1995 after undergoing surgery and physical therapy.

On December 28, 2000, Kelley suffered another back injury when working "in an awkward position" ("second injury"). App. 135-36. Kelley filed a new workers' compensation claim in January 2001. He also saw the company doctor, who suggested that his current injury was related to his 1993 injury. Neville then denied Kelley's new claim having itself concluded that Kelley "did not suffer a work-related injury." App. 325. Neville classified Kelley's injury as a "sprained [] back." App. 318. From January 8, 2001, until January 31, 2001, Kelley received workers' compensation benefits from Neville at his 1993 pay rate. After returning from leave, Kelley worked without incident from February 2001 until July 2003.

On July 22, 2003, however, Kelley experienced intense, acute pain in his lower back while at work ("third injury"). While he could not attribute this pain to a particular event, Kelley speculated that the pain could have occurred while he was "playing [] with a motor." App. 112. Kelley again saw the company doctor, who instructed him to refrain

3

from work and referred him to an orthopedist. On August 15, 2003, an MRI of Kelley's spine showed "degenerative discs [at] L3-L4, L4-L5 and L5-S1" and L3-L4 intervertebral disc bulging. App. 266. The MRI did not show "evidence of disc herniation or canal stenosis," App. 266, which previously appeared on scans after his 1993 injury. App. 281; App. 309.

Although he sought medical treatment, Kelley did not submit a new workers' compensation claim. Instead, Neville paid him workers' compensation benefits under his June 24, 1993 claim. Kelley unsuccessfully attempted to return to work on January 3, 2005. An orthopedist deemed Kelley fully disabled on January 20, 2005.

Neville paid Kelley's workers' compensation benefits for over a decade at his 1993 pay rate. See App 487-524 (showing benefits paid to and on behalf of Kelley from January 17, 1994 through June 14, 2018). By grouping the payments made due to the three injuries together, Neville believed that it had reached the SIR limit of $500,000, and notified TIG that it would seek indemnification under the Policy. TIG denied Neville's claim.

Neville sued TIG requesting a declaration that TIG had a contractual duty to indemnify Neville contending that all of Kelley's injuries arose from the June 24, 1993 incident. The parties filed cross-motions for summary judgment. The District Court denied Neville's motion and granted summary judgment for TIG. The District Court rejected Neville's argument that the second and third injuries were "recurrences" of the first injury. It concluded that each injury was an "occurrence" so that the SIR was never reached and also that if the injuries were deemed an "occupational disease" under the

4

Policy, the Policy had lapsed before coverage would have been deemed to commence.[1]

Neville timely appealed.

II.[2]

A.

We begin, as the District Court did, with the plain language of the Policy to determine the extent of coverage under its terms.  It is well-established that in Pennsylvania,

> [c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement. Courts assume that a contract's language is chosen carefully and that the parties are mindful of the language used.

In re Old Summit Mfg., LLC, 523 F.3d 134, 137 (3d Cir. 2008) (quoting Dep't of Transp. v. Pa. Indus. for Blind & Handicapped, 886 A.2d 706, 711 (Pa. Cmmw. Ct. 2005)).

Here, the Policy provides that "[t]he Company will indemnify the [i]nsured for loss resulting from an occurrence during the contract period," and "'occurrence', [sic] as applied to bodily injury, shall mean 'accident'."  App. 68.  As the District Court noted, the term "accident" is not defined by the Policy.  Thus, the District Court turned, as is

---

[1] "Occupational disease," under the Policy" was defined as including "cumulative injuries."  App. 68-69.

[2] The District Court had jurisdiction under 28 U.S.C. §§ 1331 and 1343.  We have jurisdiction under 28 U.S.C. § 1291.  We review the grant of summary judgment de novo. Lehman Bros. Holdings, Inc. v. Gateway Funding Diversified Mortg. Servs., L.P., 785 F.3d 96, 100 (3d Cir. 2015).  Summary judgment is appropriate where, viewing the evidence in the light most favorable to the respondent, "no genuine dispute exists as to any material fact, and the moving party is entitled to judgment as a matter of law." Montone v. Jersey City, 709 F.3d 181, 189 (3d Cir. 2013).

5

permitted and customary under Pennsylvania Law, to the dictionary for assistance.

Indeed, in Kvaerner, the Pennsylvania Supreme Court itself consulted the dictionary to

define the very term at issue here, "accident." Kvaerner Metals Div. of Kvaerner U.S.,

Inc. v. Com. Union Ins. Co., 908 A.2d 888, 897-98 (Pa. 2006) (quoting Webster's II New

College Dictionary 6 (2001)). There, it concluded that the term "accident" implied a

degree of "fortuity" as an "unexpected and undesirable event," or an event that "occurs

unexpectedly or unintentionally." Id. Like the Pennsylvania Supreme Court concluded

in Kvaerner, the District Court concluded that, in this case, the term "accident" meant a

single, finite event of an "unexpected or unforeseen nature." App. 15 (citation omitted).

So correctly defined, we agree with the District Court's further conclusion that Kelley's

1993, 2000, and 2003 incidents were each separate accidents and, thus, distinct

occurrences for which coverage would only have been triggered if the SIR limit of

$500,000 was met as to each occurrence.[3] While the District Court did not detail the

specific nature of the injuries in so concluding, a review of the facts bolsters its

conclusion.[4]

---

[3] As Neville did not reach the SIR limit as to any one of these occurrences, no coverage was triggered under the Policy.

[4] As for Kelley's 1993 incident, he injured his back while installing an oil pump. He was diagnosed as having suffered from an acute "disc herniation of L5-S1." App. 281-82. While he lost workdays, he ultimately returned to full-time work without restrictions in January 1996. Kelley's 2000 incident was characterized as a "sprained [] back." App. 318. Unlike his 1993 injury, Kelley received no special medical treatment for this injury and saw only Neville's company doctor who did not note or diagnose Kelley as suffering from a herniated disc. Finally, as for Kelley's 2003 incident, Kelley suffered a new and distinct injury while "playing around with a motor." App. 112. This time, unlike his 1993 injury, when he herniated a disc, and unlike his 2000 injury, when he "sprained his

6

B.

Although we conclude that the District Court did not err in its analysis and conclusion that no coverage was triggered under the Policy as explained above, we consider each of Neville's four main alleged errors and reject each in turn.

First, Neville argues that the District Court improperly referenced the dictionary to define the term "accident," which is a term that, in turn, informs the meaning of occurrence by "bodily injury." As we explained in Section III.A., above, the District Court committed no error in referencing the dictionary to define the term "accident." It is fully appropriate for courts to turn to the dictionary to define undefined terms. Kvaerner, 908 A.2d at 897-98.

Second, Neville argues that the District Court failed to restrict the meaning of "occupational disease" to those diseases enumerated under the Pennsylvania Workers' Compensation Act when it determined, in the alternative, that even if the 1993, 2000, and 2003 incidents were not separate occurrences by bodily injury, that coverage would still not be available because Kelley's injuries otherwise constituted an occupational disease occurrence which transpired after the Policy had lapsed. While Neville's argument fails because we agree with the District Court's primary conclusion and, therefore, its conclusion in the alternative was unnecessary, Neville's argument also fails because it would have us rewrite the express terms of the Policy in contravention of the well-established proposition that courts must "give effect to the intent of the contracting

_____

back," App. 318, Kelley was diagnosed as suffering from "ongoing/chronic mechanical lower back pain secondary to multilevel degenerative disk disease." App. 542.

7

parties" and "assume that a contract's language [was] chosen carefully." In re Old Summit Mfg., LLC, 523 F.3d at 137 (citation omitted).

References in the Policy to the Pennsylvania Workers' Compensation Act do not somehow incorporate the definition of the term "occupational disease" or the concept of "cumulative injuries" under the Pennsylvania Workers' Compensation Act. To read this term and concept into the Policy to replace the Policy's definition and clear language would materially alter the intent of the contracting parties as embodied by the plain language of the contract.

Third, it argues that the District Court's reading of the Policy creates an absurdity at odds with the Policy's purpose. The District Court's reading of the Policy, however, far from creating an absurdity, gives effect to the purpose of the Policy as an excess workers' compensation policy. Whereas the District Court's interpretation of the Policy is consistent with the general purpose of excess workers' compensation policies, Neville's interpretation would equate this excess policy to a primary workers' compensation policy. Compare 77 PA. CONS. STAT. §§ 1-2710 (setting forth the requirements for primary workers' compensation insurance policies) (emphasis added) with PA. DEP'T OF LAB. & INDUS., EMP.'S GUIDE TO SELF-INSURING WORKERS' COMP. 4, https://bit.ly/3JigVaS (explaining that excess insurance is typically obtained by a self-insured employer to reduce the employer's "exposure to large loss claims").

Finally, Neville's argument that the District Court failed to recognize that the Policy must be read to include the Pennsylvania Workers' Compensation Act concepts of "recurrence" and "aggravation" suffers from both flaws just referenced. These terms do

8

not appear in the Policy at issue and their meaning under the Pennsylvania Workers' Compensation Act is irrelevant here. Moreover, they are routinely employed in the analysis of coverage involving primary workers' compensation insurance policies. See, e.g., S. Abington Twp. v. W.C.A.B. (Becker and ITT Specialty Risk Servs.), 831 A.2d 175 (Pa. Cmwlth. Ct. 2003) (considering the concept of "recurrence" under a claim for workers' compensation benefits provided under a primary workers' compensation insurance policy); L.E. Smith Glass Co. v. Workers' Comp. Appeal Bd. (Clawson), 813 A.2d 634 (Pa. 2002) (same). But the Policy here is an excess policy. See 77 Pa. Stat. and Cons. Stat. § 1036.1 (West 2022) (specifically defining the term "excess insurance" for purposes of self-insured employers); San Diego Cnty. Sch. Risk Mgmt. Joint Powers Auth. v. Liberty Ins. Corp., 339 F. Supp. 3d 1019, 1029 (S.D. Cal. 2018) (concluding that state workers' compensation regulations do not apply to an excess workers' compensation policy because "an excess policy is not a workers' compensation policy.").

## III.

For these reasons, we will affirm the District Court's order.